IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| AUTOCELL LABORATORIES, INC., | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 08-760-SLR |
| | ) | |
| CISCO SYSTEMS INC., | ) | |
| | ) | |
| Defendant. | ) | |

John G. Day, Esquire, Tiffany Geyer Lydon, Esquire and Caroline Hong, Esquire of Ashby & Geddes, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Edward A Pennington, Esquire and Chadwick A Jackson, Esquire of Hanify & King PC, Washington, D.C., John D. Hanify, Esquire and Christopher M. Morrison, Esquire of Hanify & King PC, Boston, MA.

Jack B. Blumenfeld, Esquire, Karen Jacobs Louden, Esquire and Thomas C. Grimm, Esquire, of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Greg Stone, Esquire, Ted Dane, Esquire, Garth Vincent, Esquire and Kevin Goldman, Esquire of Munger Tolles & Olson, LLP, Los Angeles, CA.

**MEMORANDUM OPINION**

Dated: January 5, 2011
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Autocell Laboratories, Inc ("plaintiff") owns several patents directed to systems and methods for managing wireless networks. On October 8, 2008, plaintiff commenced this patent infringement action against defendant Cisco Systems, Inc. ("defendant"), alleging that multiple products sold by defendant infringe U.S. Patent Nos. 7,127,275 ("the '275 patent"), 7,149,539 ("the '539 patent") and 7,369,858 ("the '858 patent"). (D.I. 1) Defendant has asserted various affirmative defenses and counterclaims in response to plaintiff's complaint, including noninfringement and invalidity of the patents in suit. (D.I. 8) Fact discovery completed in April 2010. On June 23, 2010, pursuant to the parties' stipulation, the court dismissed with prejudice plaintiff's claims relating to both the '275 and the '539 patents, and to claims 3 and 4 of the '858 patent. (D.I. 132)

The parties have proffered meanings for the disputed claim limitations and move for summary judgment. Plaintiff seeks summary judgment of infringement, and defendant seeks summary judgment of invalidity and noninfringement of the '858 patent. (D.I. 155; D.I. 156; D.I. 158; D.I. 162; D.I. 165) The court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338. For the reasons that follow, the court grants defendant's motion for noninfringment, and denies all other motions.

## II. BACKGROUND

### A. The Parties And The Technology At Issue

Plaintiff develops methods for managing wireless networking traffic and reducing radio frequency interference to enhance the quality of the signal in a wireless network.

(D.I. 159 at 1-2)  Wireless networks allow computers and other related devices to communicate with each other without the need to be physically connected.  (D.I. 143, ex 2a at ¶ 7)  A wireless network generally consists of two devices:  an access point and a client ("station").  (*Id.* at ¶ 9)  The access point is a wireless communications-capable device that connects the wireless stations together, and with a wired network. (Id.)  A station varies in nature and can take the form of wireless laptops, telephones, and printers.  (*Id.* at ¶ 11)  Because of their portability, stations may switch from access point to access point as they move to different locations within a wireless network.  (*Id.*) Due to the fluid nature of a wireless network, it is sometimes advantageous for wireless networking devices to lower their transmit power in order to control the range of transmissions, reduce interference with other wireless devices, or reduce power consumption.  (*Id.* at ¶ 10)  The technology at issue concerns a method for automatically adjusting the transmit power level of a wireless networking station in response to the lowering of the transmit power level of the access point with which the station is associated.  (D.I. 159 at 5)

Defendant manufactures and sells wireless networking equipment, including access points and stations that incorporate technology allowing a station to reduce its transmit power level in response to the reduction in transmit power from an associated access point.  (D.I. 159 at 7-8)  Defendant also creates wireless networking standards that ensure interoperability of third party systems with its products.  (*Id.* at n.6)

## B. The '858 Patent

The '858 patent claims a method for automatically adjusting the transmit power

2

level of a wireless networking station in response to the lowering of the transmit power

level of the access point with which the station is associated. ('858 patent, col. 42:54-

63) The '858 patent was filed on August 26, 2004 and issued on May 6, 2008. Plaintiff

alleges that defendant's products infringe claims 1 and 2 of the '858 patent. (D.I. 156 at

10)

Claim 1 is the only independent claim asserted:

A method for use by a station capable of communicating via an
access point in a wireless communications network via a radio frequency
channel, comprising the steps of:
receiving a message from the access point, the message
containing information indicative of an amount by which to
attenuate transmit power, wherein the information is a
transmit backoff level that indicates how far the access
point's power has been reduced; and
adjusting transmit power by the indicated amount in response to
the information in the message.

(Col. 42:54-63)

Claim 2 further limits claim one:

The method of claim 1 wherein the step of adjusting transmit power
reduces the station's transmit power relative to maximum transmit power by
the transmit back off level received in the message.

(Col. 42:64-67)

## C. The Accused Products

There are two kinds of access points that are made and sold by defendant. The

first is "unified," meaning that the access points require a separate controller which is

used by a network administrator to manage and configure their settings. (D.I. 166 at 2)

In contrast, "autonomous" access points can have their settings directly set by a

network administrator via a computer interface. (Id.)

3

### 1. Allegedly infringing technology

Regardless of whether the access point is unified or autonomous, one of two different technologies are used for lowering the transmit power of a station that is associated with it. The first, Dynamic Transmit Power Control ("DTPC"), "is a new [method] that allows the access point to broadcast its transmit power. [Associated stations] can use this information to automatically configure themselves to that power while associated with that access point. In this manner, both devices transmit at the same level." (D.I. 161, ex. F at CA00056538)

The second, Transmit Power Control technology ("TPC"), provides the capability for an access point to tell an associated station to set itself to a particular transmit power. (D.I. 159 at 6) In TPC, the power value with which the station is instructed to set itself is independent of the transmit power settings of the access point. (*Id.*)

No matter the technology used, the access point instructs an associated station to set its transmit power level to a certain value by sending a wireless message to the station. This message is known as Information Element 150 ("I.E. 150"). (*Id.*) I.E. 150 is a hexadecimal value that corresponds to a transmission power in dBm.[1] (D.I. 161, ex. L at ¶ 52)

The route taken to arrive at I.E. 150's value differs slightly depending on whether the access point is unified or autonomous. If the access point is autonomous, the system administrator directly sets a decibel value in the access point's settings that

---

[1]dBm is a unit of measurement known as decibels per milliwatt, and is commonly used to describe radio transmit power. (D.I. 143, ex 2a at ¶ 19)

corresponds to the configured maximum of the access point's transmit power.[2] (*Id.* at ¶ 60) This value is then sent in I.E. 150 to associated stations. (*Id.*) If the access point is unified, the network administrator sets an integer value in the controller,[3] which is then converted by the access point into a corresponding transmit power value in dBm, and sent in I.E. 150 to associated stations.[4] (D.I. 159 at 9) Only a transmit power value in dBm is sent to the associated station, not the integer value that the controller sent to the access point. (*Id.* at 10)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from

[2] The "configured maximum" transmit power level is set either by a system administrator or I.E. 150. However, the actual transmission value may be lower because the access point's actual transmit power is constrained by regulatory and hardware limitations. (*Id.* at ¶ 59) In contrast, the "hardware maximum" transmit power level is the maximum theoretical power level at which the device is capable of transmitting.

[3] The integer value of 1 represents the highest transmit power. As the integer values go up (2, 3, 4, etc.), the access point's corresponding broadcast power values go down. (D.I. 159 at 9) Plaintiff refers to these integers as "Power Levels." (*Id.*)

[4] Once again, this value represents the upper limit to the access point's transmit power. Its actual power may be constrained by regulatory and hardware limitations. (D.I. 182 at 9)

which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. Infringement

#### 1. Standard

A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States . . . during the term of the patent." 35 U.S.C. § 271(a). A two-step analysis is employed in making an infringement determination. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir.

6

1995). First, the court must construe the asserted claims to ascertain their meaning and scope. *Id.* Construction of the claims is a question of law subject to de novo review. *See Cybor Corp. v. FAS Techs.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998). The trier of fact must then compare the properly construed claims with the accused infringing product. *Markman*, 52 F.3d at 976. This second step is a question of fact. *See Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).

"Direct infringement requires a party to perform or use each and every step or element of a claimed method or product." *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378 (Fed. Cir. 2007). "If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). If an accused product does not infringe an independent claim, it also does not infringe any claim depending thereon. *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989). The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988) (citations omitted).

## 2. Analysis

### a. "Access point"

The court interprets an access point to be a wireless communications-capable device, or a wireless communications-capable device and its controller, that connects wireless stations with each other and with a wired network. Defendant argues that the controller is a physically separate device in a unified network, and that it should not be

7

considered a part of the access point. (D.I. 143 at 11) In support of its argument, defendant reasons that, because the patent did not mention a controller, it was not contemplated by the claims. (Id.) Defendant does not cite its own expert in support of its argument. Instead, defendant cites wi-fiplanet.com, a website that contains an article written by plaintiff's expert, James T. Geier ("Geier"), wherein Geier explains the difference between "thick" and "thin" access points.[5] (Id., ex. 10 at 1-2) Defendant alleges that this article demonstrates that the term "access point" "does not include other devices such as . . . controllers that may interface with the [access point] but which do not themselves communicate wirelessly with the wireless stations." (D.I. 143 at 11) The court disagrees that this article supports defendant's contention. Rather, the article simply explains the differences between "thick" and "thin" access points just as was done earlier in this opinion. (Id., ex. 10 at 1-2) The article does not say that a person of skill in the art would consider a controller to be separate from the access point, nor does it discuss the meaning of the term "access point" as used in the '858 patent. (Id.)

In contrast, Geier's deposition testimony directly contradicts defendant's argument. During his deposition, Geier opined that one of ordinary skill in the art would understand that the combination of two devices, the access point and the controller, come together to form the functional access point. (D.I. 141, ex. H at 34:24-35:15) As defendant admits, controllers perform "[t]raditional roles of access points, such as association or authentication of wireless clients." (Id., ex. G at CA00020564) Because

---

[5] From the website's explanation, "thick" and "thin" access points correspond to autonomous and unified access points as defined by the parties.

8

much of the functionality of the access point is dependant on the controller, the court

finds that the combination of defendant's access points and controllers forms an

"access point" within the meaning of the claim limitation.

### b. "Information indicative of an amount by which to attenuate transmit power"

The court construes this limitation to mean information indicating the amount by

which the station is to reduce its power. As with various limitations at issue, the focus

of the parties' dispute has been whether instructing the station to broadcast at 15 dBm

(i.e., setting the power) is the same as instructing the station to lower transmission

power by 5 dBm, (i.e., attenuating the power) where the station was previously

broadcasting at 20 dBm. (D.I. 143 at 12) The prosecution history of the '858 patent

supports the court's conclusion that setting the station's transmit power is not the same

as attenuating the station's transmit power. Consistent with this conclusion, in an

appeal brief explaining an amendment to claim 1 of the '858 patent, plaintiff wrote:

"According to the method, the station is responsive to a message indicative of an

amount by which to **attenuate** transmit power. In other words, the access point does

not instruct the station '[to **set**] transmit at power x,' but rather '**reduce** transmit power

by x.'" (D.I. 142, ex. B at ACE00665578-79) (emphasis added)[6]

Defendant's unified and autonomous access points send a transmit value to

associated stations via I.E 150. (D.I. 159 at 6) This value comes in the form of a dBm

---

[6] Plaintiff further wrote "when an access point signals a power attenuation of X
dB in accordance with the present invention, the station learns (1) the amount by which
the it should **reduce** its own transmit power." (D.I. 142, ex. B at ACE00665581)
(emphasis added)

9

measurement that represents the maximum configured transmit power of the station.

(D.I. 161, ex. L at ¶ 52)  It is not an amount by which the station should attenuate

power, but the transmit power level itself.[7]  This is exactly the type of message that

plaintiff disclaimed during prosecution and cannot claim now.  *Felix v. Am. Honda Motor

Co., Inc.*, 562 F.3d 1167 1181-82 (Fed. Cir. 2009).  Because defendant's products

directly set stations' maximum transmit power value, its products do not infringe the

asserted claims of the '858 patent as a matter of law.[8]

### c. "Transmit backoff level that indicates how far the access point's power has been reduced"

The court construes this limitation to mean data representing the amount by

---

[7] Plaintiff attempts to argue the inverse, by claiming that the stations "do not set themselves **to** the value in I.E. 150, but instead use the value . . . to discern how far an [access point's] transmit power is backed off from maximum and the amount by which the station is to attenuate its transmit power." (D.I. 184 at 13) (emphasis in original)  In support of its argument, plaintiff relies on testing performed by defendant's expert, Dr. Vincent Poor ("Poor").  When Poor tested one of defendant's stations that had been configured to a transmission power level of 14 dBm by I.E. 150, he measured a reading that fluctuated between 11-14 dBm.  (D.I. 184 at 13)  Plaintiff argues that, because the station's transmit power did not hold steady at 14 dBm, it was reducing its power **by** an indicated amount, and not setting it **to** a specific amount.  (*Id.*)  This argument is unpersuasive as the station's operation complies with defendant's explanation that I.E. 150 sets the station's configured maximum transmit power.  (D.I. 166 at 11)  Plaintiff does not cite an expert's opinion to explain how directly setting a configured maximum transmit power at 14 dBm is the same as attenuating the power from a hardware maximum of 20 dBm.  If defendant's products had attenuated their transmit power level by the amount specified in I.E. 150, they would instead transmit at 6 dbm since 20 dBm hardware maximum - I.E. 150 value of 14 dBm = 6 dBm.  (D.I. 166 at 11-12)

[8] Plaintiff also argues that defendant induces infringement by specifying interoperability standards with its products.  (D.I. 159 at 16)  Because defendant's products do not infringe the asserted claims of the '858 patent, its standards for interoperability with said products do not infringe either.  Therefore, plaintiff's infringement by inducement arguments fail as well.  The court further notes that plaintiff does not assert a doctrine of equivalents theory in its motion for summary judgment, nor is one cited in its expert report.

which the access point's transmit power has been reduced from maximum. (Col. 8:66-9:2, 13:6-8)

Defendant argues that prosecution history estoppel requires that the transmit power backoff level be referenced from the access point's maximum transmit power. (D.I. 143 at 17) During prosecution of the '858 patent, plaintiff explained that, "[a]s described in the specification at page 19 and supporting claims 2 and 3, 'the [transmit power] [b]ackoff value indicates **how far from maximum power** the sending [access point's] radio has been turned down.'" (D.I. 142, ex. B at ACE00665579) (emphasis added) *See also id.* at ACE00665583 ("as stated in the specification, the [transmit power] [b]ackoff value indicates how far from maximum power the sending access point's radio has been turned down."). Plaintiff counters that the doctrine of claim differentiation prevents such a construction as it would render claim 2 of the '858 patent superfluous.[9] (D.I. 151 at 13)

"The doctrine of claim differentiation create[s] a presumption that each claim in a patent has a different scope." *Bradford Co. v. Conteyor N. Am., Inc.*, 603 F.3d 1262 1271 (Fed. Cir. 2010) (citing *Comark Commc'ns v. Harris Corp.,* 156 F.3d 1182, 1186 (Fed. Cir. 1998)). However, "the presumption created by the doctrine of claim differentiation is 'not a hard and fast rule and will be overcome by a contrary construction dictated by the written description or prosecution history.'" *Regents of Univ. Of Cal. v. Dakocytomation Cal., Inc.*, 517 F.3d 1364, 1375 (Fed. Cir. 2008) (citing

---

[9] This argument also fails because plaintiff later contends that "maximum transmit power" as used in claim 2 refers to the power of the station, not the access point. (D.I. 141 at 15) Therefore, under this construction, claim 2 would not be rendered superfluous.

*N. Am. Vaccine, Inc. v. Am. Cyanamid Co.,* 7 F.3d 1361, 1369 (Fed. Cir. 2005)).  Here,

the '858 patent's prosecution history overcomes the presumption found in the doctrine

of claim differentiation.  Plaintiff's statement during prosecution clearly and

unambiguously limited the transmit power backoff to an attenuated value based on the

maximum transmit power of the access point.

Similar to the limitation found in section IV(A)(2)(b) *supra*, this limitation requires

information about how much an access point's transmit power has been reduced, not

the value of its current transmit power.[10]  Because defendant's I.E. 150 message does

not specify the amount by which the access point's transmit power level has been

reduced, but instead specifies its current maximum transmit power levels, defendant's

products do not literally infringe the asserted claims of the '858 patent as a matter of

law.

### d. "Adjusting transmit power by the indicated amount"

The court construes this limitation to require reducing the station's transmit

power by the amount by which the access point's power has been reduced.  (Col. 13:6-

12)  This construction comports with Geier's opinion as to what one of ordinary skill in

the art would understand the limitation to mean.  (D.I. 141, ex. H at 110:20-112:13)

Consistent with this court's construction of the other claim limitations, the

"indicated amount" is the "transmit backoff level" which indicates both an amount by

---

[10]  Once again, the '858 patent's prosecution history support the court's
conclusion. In an attempt to distinguish the '858 patent from U.S. Patent Pub. No.
2004/0057507 ("Rotstein"), plaintiff wrote: "One distinction between Rotstein and the
claimed invention is that Rotstein's AP sends data representing the power level at
which the [access point] has been **set**, rather than the magnitude of power
**attenuation**." (D.I. 142, ex. B at ACE00665581) (emphasis added)

which the station is to attenuate transmit power, and how far the access point's power

has been reduced from the hardware maximum. (D.I. 193 at 7) Once again,

defendant's products do not reduce their transmit power by the amount indicated in I.E.

150; instead, they set their configured maximum transmit power to said amount.

Because of this set to/reduce by dichotomy, defendant's products do not infringe the

asserted claims of the '858 patent as a matter of law.

## B. Invalidity

### 1. Anticipation

#### a. Standard

The standard of proof to establish the invalidity of a patent is "clear and

convincing evidence." *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054,

1058 (Fed. Cir. 2004). In conjunction with this burden, the Federal Circuit has

explained that,

> [w]hen no prior art other than that which was considered by the PTO
> examiner is relied on by the attacker, he has the added burden of
> overcoming the deference that is due to a qualified government agency
> presumed to have properly done its job, which includes one or more
> examiners who are assumed to have some expertise in interpreting the
> references and to be familiar from their work with the level of skill in the art
> and whose duty it is to issue only valid patents.

*PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008) (quoting

*Am. Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1359 (Fed. Cir. 1984)).

An anticipation inquiry involves two steps. First, the court must construe the

claims of the patent in suit as a matter of law. *See Key Pharms. v. Hercon Labs. Corp.*,

161 F.3d 709, 714 (Fed. Cir. 1998). Second, the finder of fact must compare the

13

construed claims against the prior art.  *See id.*

Proving a patent invalid by anticipation "requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Sys. Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) (citations omitted).  The Federal Circuit has stated that "[t]here must be no difference between the claimed invention and the referenced disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991). The elements of the prior art must be arranged or combined in the same manner as in the claim at issue, but the reference need not satisfy an ipsissimis verbis test.  *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. Mar. 26, 2009) (citations omitted).  "In determining whether a patented invention is [explicitly] anticipated, the claims are read in the context of the patent specification in which they arise and in which the invention is described." *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1554 (Fed. Cir. 1995).  The prosecution history and the prior art may be consulted "[i]f needed to impart clarity or avoid ambiguity" in ascertaining whether the invention is novel or was previously known in the art.  *Id.* (internal citations omitted).

### b. Discussion

All of defendant's arguments in support of its motions for invalidity are based exclusively on plaintiff's claim construction.  (D.I. 188 at 17, 21, 29)  Because the court declined to follow plaintiff's construction in the majority of instances, defendant's briefs

14

are no longer relevant, and its motions for invalidity are denied.

## V. CONCLUSION

For the reasons stated above, defendant's products do not infringe the asserted claims of the '858 patent under the court's claim construction. Therefore defendant's motion for summary judgment of noninfringement is granted, plaintiff's motion for summary judgment of infringement is denied, and defendant's motions for summary judgment of invalidity are denied.

An appropriate order shall issue.